J. D. O'Connor and Blanche J. O'Connor v. Commissioner.
O'Connor v. Comm'r
Docket Nos. 36461, 36462.
United States Tax Court
T.C. Memo 1954-90; 1954 Tax Ct. Memo LEXIS 161; 13 T.C.M. (CCH) 623; T.C.M. (RIA) 54195; June 30, 1954, Filed *161 1. During 1945 and 1946, three journal entries were made on petitioners' books indicating an additional contribution to capital by petitioner, in the form of materials and supplies, amounting to $25,104.96. Respondent determined that no additional contribution to capital had been made, and that the materials and supplies in question had been left over from various construction jobs to which they had previously been charged as an expense. The evidence does not substantiate petitioners' contention that the materials and supplies had been purchased and accumulated prior to the organization of the present business. Held, petitioners overstated their deductions for the cost of goods sold by $11,712.03 and $13,392.93 for 1945 and 1946, respectively. 2. Held, further, bonus paid to an employee was paid within 2 1/2 months following the close of the taxable year and was reasonable in amount. 3. Held, further, deduction of $18,501.98 for a reserve for bad debts in 1946 was unreasonable in amount. 4. Held, further, petitioners are entitled to a deduction of a net loss of $4,740.53 sustained on the sale of 4 houses in 1946. 5. Held, further, amounts expended by petitioner in furtherance of *162 a corporation of which he was a stockholder cannot be deducted as ordinary and necessary business expenses. 6. Held, further, respondent's disallowance of 50 per cent of the $2,080.97 deduction claimed for entertainment expenses is sustained for lack of proof that the total amount consisted of ordinary and necessary business expenses. 7. Held, further, petitioners have failed to overcome respondent's determination of proper depreciation rates for equipment used in their business. 8. Held, further, petitioners have failed to overcome respondent's determination of the proper depreciable cost and estimated life to be used in computing depreciation of their rental properties. George D. Hardisty, Esq., and Herbert F. Baker, C.P.A., 525 Market Street, San Francisco, Calif., for the petitioners. Wayne L. Prim, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion RICE, Judge: These consolidated proceedings involve deficiencies in income tax determined against the petitioners as follows: Year
J. D. O'Connor
Blanche J. O'Connor
1945
$ 5,544.06
$ 5,544.06
1946
11,216.43
11,216.43
Total
$16,760.49
$16,760.49
The issues to be decided are: (1) whether deductions for opening inventories of *163 $11,712.03 and $13,392.93 for 1945 and 1946, respectively, were properly disallowed by respondent on the theory that such amounts represented surplus inventories which had previously been charged to the expense of various jobs during these years; (2) whether the amount of $5,000, claimed by petitioners as a deduction for the salary of C. R. O'Connor in 1945, was paid within 2 1/2 months of the close of that taxable year as required by section 24(c) of the Internal Revenue Code; further, if the $5,000 was so paid, whether it constituted reasonable compensation; (3) whether a deduction of $18,501.98 for a reserve for bad debts, claimed by petitioners on their returns for 1946, was unreasonable in amount; (4) whether petitioners sustained a net loss of $4,740.53 in 1946 on the sale of 4 houses; (5) whether the amount of $1,040.73 expended by petitioner in furtherance of a corporate venture in 1946 represents an ordinary and necessary business expense; (6) whether respondent properly disallowed 50 per cent of the $2,080.97 deduction for entertainment expenses claimed by petitioners on their returns for 1946; (7) whether deductions claimed by petitioners for 1945 and 1946 for the depreciation *164 of equipment used in their business were excessive due to the underestimate of the useful life of such equipment; and (8) whether the petitioners sustained depreciation on rental properties in excess of the amount of $280 for each of the years 1945 and 1946. Certain other issues raised by the pleadings have been conceded, and will be taken into account under a Rule 50 computation. Some of the facts were stipulated. General Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. J. D. O'Connor (hereinafter referred to as petitioner) and Blanche J. O'Connor were husband and wife residing in San Francisco, California, during the years here in issue. They filed individual returns for these years reporting their income on the community-property basis with the collector of internal revenue for the first district of California. Prior to January 1, 1945, petitioner had worked as a salaried construction worker, and at various times, had been engaged as an independent contractor. On January 1, 1945, he again established his own contracting business. He operated it as an individual enterprise throughout the years 1945 and 1946 under the name of J. D. *165 O'Connor Construction Company (hereinafter referred to as the Company). Issue 1: Inventory Adjustments. Findings of Fact Petitioner engaged an accountant who set up an accounting system on the accrual basis. Initially, the books and records were kept by petitioner's wife, Blanche O'Connor. On February 5, 1945, petitioner submitted a statement of the Company's net worth to the American Trust Company, San Francisco, California, in which he listed the following assets and liabilities: ASSETS
Cash in Banks
$12,500
Form Lumber
1,200
Real Property: Parker, Arizona
$17,000
Corte Madera, California
10,000
27,000
Machinery and Equipment
3,000
Auto
2,200
Loan to Brother
1,000
Furniture
6,000
Total
$52,900
LIABILITIES
Accounts Payable
$ 1,300
Mortgages on Real Estate
5,400
Total
$ 6,700
Petitioner stated, on this net-worth statement, that the various amounts were based on actual inventories which he had personally taken. During the year 1945, petitioner made substantial purchases of materials and supplies for use on various construction projects he was engaged in. These projects had a total cost of $371,692.63 in 1945. On September 30, 1945, the following journal entry was made on petitioner's books: Journal Entry *166 16 September 30, 1945 Inventory, materials and supplies
$11,712.03
J. D. O'Connor capital
$11,712.03
Explanation:
To set up inventory materials and supplies on hand Jan. 1, 1945 as per details in working papers
The following additional explanation of this journal entry was attached to supporting schedules of materials and supplies by the accountant or bookkeeper who prepared the entry: "Inventory of Materials and Supplies - owned by J. D. O'Connor at beginning of year. He states that he acquired the various items of materials by purchasing from various projects on which he worked through several past years. The following inventory figures are arrived at by an actual inventory taken at 5th & Shipley Warehouse at 9/30/45 - all of which material we are informed was all on hand at Jan. 1, 1945." On December 31, 1946, the following journal entries were made on petitioner's books: Journal Entry 37
December 31, 1946 Inventory
$ 7,586.09
J. D. O'Connor capital
$ 7,586.09
Explanation:
To charge inventory with construction materials used on Jobs 16, 18, 20, 27, 29 and 30 and credited to inventory which was supplied from stock owned by J. D. O'Connor not carried on books.
Journal *167 Entry 37
December 31, 1946 Inventory
$ 5,806.84
J. D. O'Connor capital
$ 5,806.84
Explanation:
To set up inventory materials and supplies on hand at Dec. 31, 1946, acquired from stock owned by J. D. O'Connor and not carried on the books.
Respondent determined that these journal entries resulted in the understatement of petitioner's income for 1945 and 1946, and he determined deficiencies accordingly. The following explanation was given in the deficiency notices sent to the petitioners: "On September 30, 1945, you made a journal entry in which you debited 'materials inventory' and credited your capital account with $11,712.03. On or about December 31, 1946, you made a similar entry debiting materials inventory and crediting your capital account with $13,392.93. There is no evidence available to show that the increase in the asset account and in your capital account resulted from contributions of capital by you from sources outside your business, or in any way resulted other than from a failure to correctly determine your true net income by properly accounting for materials not used on construction jobs but which previously had been charged to expense, thus overstating construction *168 expenses. The effect of the entries is to increase your capital account by amounts which should properly have been reflected in the earnings of the business in each year. Your income is adjusted accordingly." Opinion It is axiomatic that a taxpayer must be able to substantiate the various deductions which he claims from gross income. A taxpayer who is on the accrual system must be prepared to show not only that the purchases claimed were actually made during the taxable year, but that they were expended for the production of income and do not represent assets in his possession at the close of that year. See David Baird & Son, Inc., 2 B.T.A. 901 (1925). When materials and supplies which have been charged to production are not fully consumed in the production process, those remaining must be deducted from the cost of goods sold and set up as inventory. The inventory adjustments here in issue indicate that petitioner had contributed various materials and supplies as an additional capital investment in the Company. The respondent has determined that they atcually represent purchases of materials and supplies which were deducted on petitioners' returns as the cost of various construction *169 jobs but, in reality, were not required on these jobs and were returned to inventory. Petitioners have not attempted to meet respondent's contention by showing that all materials and supplies charged to construction jobs were actually so used. Instead, they have argued that these journal adjustments on September 30, 1945, and December 31, 1946, represent inventories of shovels, saws, drills, wheelbarrows, hoses, concrete mixers, etc., possessed by the petitioners prior to the organization of the business, and that they had inadvertently forgotten to enter them on their books until each of these dates. We are unable to accept petitioners' explanation of these journal entries in view of the complete lack of supporting evidence and petitioner's prior inconsistent net-worth statement. It is improbable that one who gives a net-worth statement to a bank for credit purposes would omit an inventory of $25,104.96, when this inventory would have increased the stated net worth by over 50 per cent. The only merchandise inventory listed by petitioners amounted to $1,200; and this was counterbalanced by accounts payable of $1,300, indicating that it might have been acquired between January 1, 1945, *170 and the date of the statement, February 5, 1945. Petitioner's recital of years of frugal living, during which this purported $25,104.96 inventory was purchased in anticipation of the time when he would again enter his own business, does not support a lapse of memory with regard to it when submitting a net-worth statement. Nor have petitioners introduced any bills or records evidencing the purchase of the various items comprising this inventory, any independent testimony as to where they were stored, or any freight receipts supporting the purported transportation of some items from Parker, Arizona, to California. It would have been simple to have obtained some documentary evidence or oral testimony in support of purchases purported to have been made prior to January 1, 1945, from the vendors of such merchandise. Petitioners have substantiated neither the existence of these inventories on January 1, 1945, nor the total cost of materials claimed as construction expenses for 1945 and 1946. Respondent's determination is accordingly sustained. Issue 2: Bonus - Time of Payment and Reasonableness. Findings of Fact In June 1945, petitioner was awarded a contract for the construction of a troophousing *171 and transit depot. Requiring a general superintendent for this project, he offered the position to his brother, C. R. O'Connor (hereinafter referred to as the brother). His brother, a qualified construction engineer and superintendent, was employed at that time as a civilian post engineer at the United States Ordnance Depot, Tooele, Utah. He had acted as general superintendent during the construction of the depot, receiving a minimum salary of $750 a month from the civilian contractor. Subsequently, as post engineer, he received a salary of approximately $500 a month plus the usual sick leave, vacations, and retirement benefits of a government employee. Petitioner offered his brother a salary of $600 a month and a percentage of any profits on the troop-housing project. There was a shortage in that area of men of his brother's ability at that time, and general contractors frequently paid bonuses to induce such men to change employment. Petitioner's brother accepted this offer and started working for petitioner on or about August 15, 1945. His duties as general superintendent of the troop-housing project required more skill and greater responsibility than his previous position at the *172 Tooele Ordnance Depot. After the troop-housing project was completed, early in 1946, petitioner's brother acted as general superintendent on the construction of a group of houses for the petitioner. In addition to the salary of $2,746.14 which petitioner paid to his brother for the last 4 1/2 months of 1945, petitioner accrued on his books the amount of $5,000 at the end of that year. This amount was liquidated settlement of petitioner's liability to pay his brother a percentage of the profits on the troop-housing project and was denoted as a "bonus payable" on the Company's books. Petitioners claimed it as a deduction on their returns for 1945. Petitioner's brother continued to be employed by petitioner during the entire calendar year 1946, but no bonus was accrued or paid to him for this period. On March 8, 1946, the Company issued a check in the amount of $4,964.92 to petitioner's brother. This was in full payment of the accrued bonus liability of $5,000, less deductions for various payroll taxes. He deposited this check on March 13, 1946. Two or three days after receipt of the check, he agreed to loan to petitioner, who was then short of working capital, the net amount which petitioner *173 had just paid him as his bonus. He accordingly issued his check to petitioner in the amount of $4,964.92, and this amount was entered on the Company's cash receipts book for the month of March 1946. It was originally entered as an account payable, but was changed by a journal entry to the notes payable account prior to the end of 1946. No payments were made on this note during 1946, but $3,230 was paid on it during 1947 and the liability was extinguished by November 5, 1953. The $5,000 bonus paid to petitioner's brother for services rendered during the year 1945 was paid within 2 1/2 months following the close of the taxable year, and was reasonable compensation for such services. Opinion The respondent argues that although the Company had accrued on its books at the end of 1945 the $5,000 bonus payable to petitioner's brother, this amount may not be deducted as a business expense for that year because it was not paid within 2 1/2 months following the close of the taxable year. The applicable portion of section 24(c) is set forth in the margin. [1] In the alternative, he contends that if we find this amount to have been paid prior to March 16, 1946, it is not deductible under section 23(a) *174 because it constitutes unreasonable compensation. We think that petitioners have clearly demonstrated that the $5,000 bonus was, in fact, paid to petitioner's brother within 2 1/2 months following the close of their taxable year. The amount due petitioner's brother was determined prior to the close of their taxable year and was accrued on their books at that time. On the following March 8, 1946, less than 2 1/2 months later, they extinguished that liability by issuing a check to him in full payment. That this was no empty transaction is indicated by the fact that various payroll taxes were deducted from the gross amount of $5,000 which was due him. This amount was unqualifiedly his, to do with as he wished. He had the unrestricted use of this money and elected to deposit it in his bank account on March 13, 1946. It has *175 not been contended and it does not appear that the Company had an insufficient bank balance to meet this check. H & H Drilling Co., 15 T.C. 961 (1950). An interval of several days elapsed between the time of receipt of this sum and the time he elected, at petitioner's urging, to lend a like amount to the Company because of its need for working capital. The evidence indicates that this was an entirely voluntary act upon his part. Similarity of the amounts and proximity of the checks cannot affect the fact that payment of his bonus had been made to him. We have previously considered the meaning of the word "paid" in reference to the payment of corporate dividends and have held that, even though the dividend check is endorsed by the payee back to the payor, such dividend has been paid. Edgar M. Soreng, 4 T.C. 870 (1945), affd. 158 Fed. (2d) 340 (C.A. 7, 1946); Pacific Grape Products Co., 42 B.T.A. 914 (1940). The essential element is that the control of property distributed by way of a dividend must have passed absolutely and irrevocably from the distributing corporation to its stockholders. See Royal Mfg. Co. v. Commissioner, 139 Fed. (2d) 958 (C.A. 3, 1943). The loan made by *176 petitioner's brother cannot negate the previous payment of the debt due him from the Company, since such payment was irrevocable and unqualified. Respondent's alternative argument as to nondeductibility of the $5,000 bonus must also be denied. Reasonableness of compensation is a question of fact to be determined by the precise facts of each case. Gray & Co. v. U.S., 68 Ct. Cl. 480, 35 Fed. (2d) 968 (1929). In view of the skill and ability of petitioner's brother, the nature of his work, the degree of responsibility required of him, and his past earning record, we have found as an ultimate fact that the salary and bonus paid him for the year 1945 were reasonable. Able supervisory employees in the contracting field were scarce in 1945, and it was customary to pay bonuses to such individuals to entice them to change jobs. Petitioner's brother had a comfortable government job at an ordnance depot at that time. It was entirely logical that petitioner should promise him a percentage of the profits in order to secure his services as general superintendent for the troop-housing contract. The base salary plus a share of the profits were not out of line with previous earnings of his brother, *177 especially when the contingent nature of the profits is considered. The fact that petitioner and his brother decided to alter this arrangement, at the end of 1945, by substituting a bonus of $5,000 for the contingent share of the profits, does not alter its reasonableness. Neither of them could know, at that time, what the net profits on the troop-housing project would be upon its completion several months later. The $5,000 bonus paid to petitioner's brother was commensurate with his duties and responsibilities. Issue 3: Reserve for Bad Debts. Findings of Fact In the latter part of 1945, petitioner entered into an agreement with one Paul C. Willmore (hereinafter referred to as Willmore) and one Tom Cleverdon (hereinafter referred to as Cleverdon) under which a large residential development was to be undertaken. They incorporated the San Jose Building Company (hereinafter referred to as San Jose) as the vehicle for the development of this project. Petitioner and Willmore each acquired 47 per cent of the capital stock of San Jose, and the remaining 6 per cent was issued to Cleverdon. There was no precise arrangement for the conduct of the entire undertaking. Pursuant to an oral agreement, *178 petitioner's Company was to construct the houses for San Jose at cost plus 10 per cent for overhead and an additional 5 per cent as profit. Operations were commenced in 1946, and petitioners reported a profit of $41,929.62 on their income tax returns for that year from the construction of houses for San Jose. During the latter part of 1946, several controversies developed between the 3 stockholders in San Jose. A principal point of disagreement was with respect to the amount of overhead expense being charged to the corporation by petitioner's contracting company. In an attempt to resolve the controversies, Cleverdon enlisted the aid of one Charles J. Hendrickson (hereinafter referred to as Hendrickson), and the other 2 stockholders acquiesced. Hendrickson was an efficiency expert and an attorney. He was employed to assist in the management of San Jose, and did so from September to November of 1946. He entered petitioner's employ on January 1, 1947. By the end of the year 1946, the Company had accumulated charges on its books amounting to $37,003.96, representing the stipulated 10 per cent overhead. After discussions between the parties, an agreement was reached eliminating one-half *179 of these overhead charges. The Company accordingly issued a credit memorandum in favor of San Jose in the amount of $18,501.98 on December 31, 1946. On the same date the Company set up a reserve for bad debts and credited to this account the balance of $18,501.98 due from San Jose for overhead charges. The controversy as to the overhead charges had not been completely settled at that time, despite the issuance of the credit memorandum for one-half of these charges. At that date, December 31, 1946, San Jose owed the Company $81,712.77. The San Jose operation was completed by September 1947. During 1947, collections on the San Jose account exceeded the billings. A balance of $7,954.64, existing on the books of the Company at the conclusion of operations, was charged to the $18,501.98 reserve for bad debts which had been previously set up. Respondent determined that the $18,501.98 which petitioners claimed as a deduction for a reserve for bad debts on their returns for 1946 was excessive. Respondent disallowed all but $4,065.75 of this amount. A reasonable reserve for bad debts of the Company at December 31, 1946, did not exceed the amount of $4,065.75. Opinion The determination of what *180 constitutes a reasonable reserve for bad debts must be made according to the conditions and circumstances existing at the time such reserve is estimated. C. P. Ford & Co., Inc., 28 B.T.A. 156 (1933). To overcome respondent's determination that a reserve of $4,065.75 was reasonable in view of the situation at the end of 1946, rather than the $18,501.98 which they claim, petitioners must show that such determination is unreasonable. Section 23(k)(1) of the Code [2] provides for the deduction of a reasonable addition to a reserve for bad debts only in the Commissioner's discretion. As we stated in C. P. Ford & Co., Inc., supra: "* * * A taxpayer has an absolute right to choose to deduct his worthless debts when they are ascertained to be worthless and charged off, but if instead he chooses to deduct additions to a reserve, he subjects himself to the reasonable discretion of the Commissioner. Reserves of any sort are not ordinarily deductible, Spring Canyon Coal Co. v. Commissioner, 43 Fed. (2d) 78, and when Congress so far departs from the customary practice as to permit such a deduction as to a bad debt reserve, the condition is as important as the permission. Such a deduction presents *181 substantial problems of administration, and it can not be assumed that Congress intended either that the taxpayer's unrestrained judgment as to the propriety or wisdom of his method or that the Board's judgment in a particular case when not supported by broad administrative considerations as well as the taxpayer's individual premises should override the Commissioner's sound discretion. That the Board has jurisdiction to review his determination does not mean that its judgment is to be substituted for that of the Commissioner merely because both may be within the bounds of reason. * * *" On December 31, 1946, petitioners set up a reserve for bad debts in the amount of the $18,501.98 due from San Jose for overhead charges. Both petitioner and Hendrickson testified that in their opinion, at the end of 1946, the balance of the overhead charges was uncollectible. However, the business judgment of petitioner and his former employee is not controlling, but must be supported by the evidence. Walter H. Goodrich & Co., 40 B.T.A. 960 (1939). The evidence introduced by petitioner does not convince us that the situation at the end of 1946 indicated that there would be a complete failure to collect *182 the $18,501.98 then owed the Company by San Jose. Moreover, these statements of petitioner and his former employee are incompatible with other portions of their testimony. Thus, petitioner stated that when he broached the subject of employment to Hendrickson, in November 1946, the controversy had already been completely settled. It would appear that the credit memorandum for 50 per cent of the overhead charges represented the settlement of the dispute. We cannot believe that petitioner and Hendrickson still doubted the collectibility of the entire balance, since petitioner continued negotiations with the opposing stockholders. These negotiations are not the conduct to be expected of one who has decided that a debt is uncollectible. Nor is the petitioner's estimate supported by reference to the ultimate settlement reached by the parties in April 1947. See Mill Factors Corporation, 14 T.C. 1366 (1950); Farmville Oil & Fertilizer Co. v. Commissioner, 78 Fed. (2d) 83 (C.A. 4, 1935). Although petitioner has not stated the details of the settlement, or admitted what portion of the $18,501.98 was not collected, it would appear that of the total sales made to San Jose, which were in excess *183 of $380,000 in 1946 alone, only $7,954.64 had to be eventually charge off as a bad debt. Part of this amount may be attributable to additional sales made in 1947, thus reducing the December 31, 1946, balance of the San Jose account which was not collectible. Petitioners have introduced no substantial evidence as to the need for a bad-debt reserve at December 31, 1946, for the San Jose account other than the $18,501.98 in overhead charges, or for any of their other accounts receivable. On the evidence before us, respondent's determination does not appear to be unreasonable and is sustained. Issue 4: Loss on Sale of 4 Houses. Findings of Fact During 1946 petitioners purchased a tract of land in Corte Madera, California. The tract was divided into 5 lots, and petitioner commenced the construction of 5 houses thereon. During the construction, he selected one as his personal residence. He redivided the lots so that his residence would occupy what had originally been Lot 1 and portions of Lots 2 and 3. The residence built for the petitioners had many additional refinements not found in the other 4 houses. Some of these refinements were an additional bedroom, an additional bathroom, a slate *184 roof rather than a shingle roof, an additional fireplace located in the bedroom, a larger fireplace in the living room, and indirect lighting. These additions substantially increased the cost of petitioners' personal residence. Petitioner allocated $18,500 of the total cost to his personal residence and, on his return for 1946, reported a loss on the sale of the remaining 4 houses, calculated as follows: Total Cost of 5 Lots and Houses
$59,440.53
Less: Cost of Personal Residence
18,500.00
Cost of 4 Houses Sold
$40,940.53
Selling Price of 4 Houses
36,200.00
Net Loss on 4 Houses
$ 4,740.53
Respondent disallowed the loss claimed by petitioners on the sale of the 4 houses because of the petitioner's failure to keep separate records showing the actual cost of his personal residence and the cost of the 4 houses. At the hearing, petitioners were granted leave to file an amended petition claiming a loss in excess of the $4,740.53 claimed on their 1946 returns on the theory that the cost of their personal residence was less than $18,500. Such amended petition was duly filed. The portion of the total cost of the 5 houses and lots which was expended on petitioners' personal residence was not less than *185 $18,500. Opinion The only item here in issue is the cost of petitioners' personal residence. Petitioner testified that the $18,500 cost allocated to it on his books and 1946 return was a fair one. Subsequently his brother, who had supervised the actual construction of the 5 houses, testified that petitioner's allocation to his personal residence was several thousand dollars too large. Petitioner now relies on this statement of his brother, and by amended petition claims that his house cost no more than the 4 which were sold, and that he consequently realized a loss of $11,352.43 rather than $4,740.53. On the basis of the testimony of petitioner and his brother as to the extensive additions made to petitioners' personal residence, we have found as a fact that petitioners' original allocation of $18,500 as its cost was justified. It is obvious that the cost of this house was substantially greater than the average cost of the other 4. In the absence of specific bills and records, we have relied on the $18,500 allocation made by petitioner at the time of construction and which he still thought to be fair at the time of the hearing. Petitioners are, therefore, entitled to the $4,740.53 *186 loss they claimed on their 1946 returns. They have not proven the $11,352.43 loss claimed in their amended petitions. Issue 5: Expenditures on Behalf of Corporation Findings of Fact In 1946 petitioner was asked to undertake the construction of 200 homes for the Manor Homes Company in Los Angeles, California. Petitioner was actively engaged in the San Francisco area at that time and did not desire to personally undertake this Los Angeles project. However, petitioner and two others organized a corporation, the General Construction Engineering Company, and it entered into a contract to build these homes. Petitioner acquired a 1/3 interest in the corporation at a cost of $5,000. Petitioner also purchased 50 shares of the capital stock of the Manor Homes Company at a cost of $5,000. Petitioner made frequent trips to Los Angeles. He gave those engaged in the project the benefit of his experience, advising them on various construction problems. This transaction was separate and distinct from petitioner's contracting business in San Francisco. Petitioners deducted the total cost of these trips to Los Angeles, amounting to $1,040.73, as miscellaneous general expenses on their returns for 1946. *187 Respondent determined that this amount did not constitute an ordinary and necessary business expense, and disallowed it. Opinion
The evidence on this issue is vague and incomplete, and we are unable to decide what portion, if any, of these expenses was spent prior to the incorporation of the Los Angeles Construction Company. Respondent contends that a substantial portion thereof was spent prior to incorporation. However, it is clear that travel expenses incurred prior to the establishment of a new business are not deductible either as ordinary and necessary business expenses or as nontrade or nonbusiness expenses. Prior to the organization of the new business, the taxpayer had neither a business nor a present right to income or to income-producing property, and consequently such expenses do not come within the scope of either 23(a)(1)(A) or 23(a)(2). Morton Frank, 20 T.C. 511 (1953). After the organization of the corporation, it was a separate and distinct business. Amounts spent by petitioner in his various trips to Los Angeles were not incurred on behalf of his own trade or business, but, rather, on behalf of that of the corporation. Hence, they are not deductible under section 23(a)(1)(A). *188 Nor do we believe that amounts spent in travel by even a one-third stockholder in a corporation for the purpose of consultations with the management are deductible as a nontrade or nonbusiness expense under section 23(a)(2). A stockholder may deduct the cost of investment counsel, a safe-deposit box, and secretarial help required in the management of his investments. However, we do not regard it as ordinary and necessary that he actively participate in the management of the corporations in which he owns stock. The cost of services rendered by petitioner was properly an expense of the corporation, and would be deductible by it, had it reimbursed him. Cf. Low v. Nunan, 154 Fed. (2d) 261 (C.A. 2, 1946); see Deputy v. du Pont, 308 U.S. 488 (1940). Issue 6: Entertainment Expenses Findings of Fact Petitioners claimed as a deduction the amount of $2,080.97 as entertainment and promotion expenses on their returns for 1946. Respondent disallowed $1,040.48 of this amount on the basis that petitioners had failed to substantiate the expenditure of the total amount as ordinary and necessary business expenses, rather than personal expenses. Opinion
Petitioners contend that the total amount claimed *189 as a deduction on their returns for entertainment and promotion expenses was spent for lunches and dinners at restaurants, and the entertainment of clients at petitioners' home; that the recipients of the luncheons were not only prospective customers, but also vendors and subcontractors who were engaged in selling goods and services to petitioner; and that these latter individuals would repay petitioner by purchasing his regular lunch on an equal number of occasions. Petitioners have submitted no bills or records to prove the expenditure of the total amount claimed as a deduction. Petitioner's testimony on this point was vague and general, naming no recipients and giving no details of the alleged expenditures. Nor have they shown that one-half of the amount was not spent for personal expenses rather than ordinary and necessary business expenses. The deduction of expenses incurred in entertaining at one's home must be subject to special scrutiny. Petitioner's vague testimony in regard to such entertainment, and his recital of reciprocal lunches with suppliers cannot support the deductions claimed. Consequently, the respondent's allowance of 50 per cent of the amount claimed appears *190 entirely reasonable, and there is no need for us to apply the rule of Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930). Issue 7: Depreciation - Business Equipment Findings of Fact Petitioners claimed deductions in the amounts of $2,859.96 and $6,642.68 for the years 1945 and 1946, respectively, for the depreciation of various items of equipment which they had acquired and were using in their contracting business. Respondent determined that such deductions were overstated in the amount of $430.48, in 1945, and $1,370.24, in 1946, due to petitioners' understimate of the useful life of certain items. Set forth below are the items of equipment with respect to which this determination has been contested by petitioners, the date each was acquired, the estimated life used by petitioners on their returns, and that determined by the respondent: Estimated Useful Life
Date Acquired
Petitioner
Respondent
G.M.C. - 1 1/2 Ton Truck
7/11/45
4
8
Heil Hoist Model 1821
7/31/45
4
8
G.M.C. - 1 1/2 Ton Truck
7/11/45
4
8
Heil Hoist Model 1821
7/12/45
4
8
G.M.C. - 1 1/2 Ton Truck
7/18/46
4
8
Heil Hoist Model 1721
7/18/46
4
8
G-7 Caterpillar Tractor
6/28/46
5
8
Jaeger Air Compressor
5/15/45
5
8
Two of the G.M.C. trucks and the Jaer air *191 compressor were still being used by petitioner in October 1953. The utility of the 2 trucks was very limited by October 1953, and they were no longer licensed. Opinion
Petitioners have failed to introduce sufficient evidence to convince us that respondent's determination of an 8-year useful life for the various items of equipment in dispute should be set aside. They have relied on petitioner's testimony that, for 7 of the 8 items in question, the useful life they had assigned was in accordance with that prescribed by the Associated General Contractors of America. Petitioner also stated that, with regard to the Caterpillar Tractor, he had followed the manufacturer's estimate of its useful life. However, this testimony was hearsay, and no documentary evidence was introduced to show that these were, in fact, the estimates of the association and the manufacturer. Nor was there either documentary or oral evidence to identify the nature and composition of this association, or to show the nature and conditions of work for which these estimates of the useful life of the machines had been prescribed. The rate of depreciation is solely a question of fact to be determined according to the particular *192 conditions under which a machine will be used. Assuming the reliability of the independent estimates introduced by the petitioner, he has not met his burden of showing that the conditions under which his machines were used were the same as those implicit in industry-wide estimates. Estimates of petitioner and his brother as to the useful life of the items in issue are not sufficient to upset the respondent's determination. Neither of them were impartial experts, and their judgment of the useful life of these items is not binding upon us. Uncasville Mfg. Co. v. Commissioner, 55 Fed. (2d) 893 (C.A. 2, 1932), certiorari denied 286 U.S. 545 (1932). Reputable as their judgments may be, they must be supported by independent evidence of the correct useful life before the respondent's determination can be disturbed. Southern California Freight Lines, Ltd., 36 B.T.A. 328 (1937), affd. 99 Fed. (2d) 104 (C.A. 9, 1938), certiorari denied 306 U.S. 632 (1939); Uncasville Mfg. Co., supra.
Issue 8: Depreciation - Houses and FurnitureFindings of Fact
During the years 1937 and 1938, petitioner constructed two 6-room houses and one 4-room house in the town of Parker, Arizona. He supervised *193 the construction and contributed a substantial part of the labor himself. The houses were of adobe construction. Petitioner's brother, C. R. O'Connor, who is a skilled mason, assisted in constructing the masonry of the houses. Petitioner furnished the 3 houses with a medium grade of furniture, and rented them to tenants. His absence from Parker, Arizona, required that he utilize the services of a rental agency. On their returns for 1945 and 1946, petitioners claimed deductions for depreciation of the houses and furnishings, computed on the basis of depreciable costs of $10,000 for the 3 houses and $6,000 for their furnishings. The estimated life of the houses and furnishings was stated as 20 and 10 years, respectively. Based on these depreciable costs and estimated lives, the petitioners reported a net loss from the property of $1,064.96 for 1945 and $216.56 for 1946. Respondent disallowed the deduction of such losses for 1945 and 1946 and determined that petitioners had additional income from rents in these years. He gave the following explanation in his deficiency notices: "In arriving at reported net loss from rental properties in each of the years 1945 and 1946, you have computed *194 depreciation on dwellings using a basis of $10,000.00, and you have computed depreciation on furnishings using a basis of $6,000.00. You have failed to substantiate either amount as the proper basis in determining allowable depreciation. From evidence available it is held that a basis of $7,000.00 and a useful life of twenty-five years should be used in computing allowable depreciation on dwellings. It is further held that there remains no unde rpreciated basis for computing additional allowable depreciation on furnishings. Your income is adjusted accordingly." At the time of the hearing, petitioner no longer had bills or records as to the cost of the houses and furnishings. F.H.A. mortgages totaling $4,000 had been secured upon the 3 houses and the lots when the construction was completed; this was the maximum loan obtainable. The town of Parker, Arizona, is a small desert town with unpaved streets. Loose sand from the surrounding countryside is blown through the air continuously and materially reduces the life of furniture in the homes in the area. The 3 houses had a cost to petitioner of an amount not exceeding $7,000 and a useful life of 25 years. During 1945, no undepreciated *195 cost remained with respect to the furniture. Opinion
Petitioners contest adjustments made by the respondent in two essential elements of their depreciation deductions; namely. the depreciable costs of the houses and furniture and the estimated lives of each. The nature of these issues is entirely a factual one, but petitioners have introduced very little evidence in their efforts to overcome the presumptive correctness of respondent's determination. In the absence of specific bills or records proving the actual cost of the 3 houses, petitioner has relied on testimony of himself and his brother estimating construction costs in Parker, Arizona, during 1937 and 1938. However, petitioner's testimony was not in point since he spoke of the cost of constructing frame houses, whereas the instant houses are of adobe construction. Nor was the testimony of his brother very helpful. As we stated previously with respect to the depreciation of business equipment, neither petitioner nor his brother were impartial experts; their estimates of the cost of these houses is not binding upon us. See Uncasville Mfg. Co. v. Commissioner, supra.On this state of the record, respondent's determination as to *196 the depreciable cost of the 3 houses is affirmed. Petitioners have also failed to prove that the houses had a useful life of 20 years, rather than the 25-year period determined by the respondent. The determination of the useful life of a building must be made in accordance with the facts known or reasonably anticipated at the time the depreciation was taken. See Regulations 111, Section 29.23(1)-5; 4 Mertens, Law of Federal Income Taxation, Section 23.100 (1942). Although these houses were in a desert town and under the absentee supervision of a rental agency, the evidence is insufficient for us to hold that their remaining useful life in 1945 and 1946 should have been calculated on a basis other than a 25-year period. The recital of substantial renovation and repairs required in 1950 does not prove their condition and remaining useful life in 1945 and 1946. Petitioners introduced no evidence as to the useful life of the furniture; hence, respondent's determination of a useful life of 7 years is sustained. Since this period has elapsed prior to the first year here in issue, we need not be concerned with the disputed cost of this furniture. Decisions will be entered under Rule 50 Footnotes
1. SEC. 24. ITEMS NOT DEDUCTIBLE. * * *
(c) Unpaid Expenses and Interest. - In computing net income no deduction shall be allowed under section 23(a), relating to expenses incurred, or under section 23(b), relating to interest accrued - (1) If such expenses or interest are not paid within the taxable year or within two and one half months after the close thereof * * *.↩
2. (2) SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:
* * *
(k) Bad Debts.--
(1) General Rule.--Debts which become worthless within the taxable year; or in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *↩